# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

TERRY D. TILMON                                    CIVIL ACTION NO. 05-cv-2170

VERSUS                                              JUDGE HICKS

WARDEN WINN CORRECTIONAL                            MAGISTRATE JUDGE HORNSBY
CENTER

## REPORT AND RECOMMENDATION

**Introduction**

Terry Tilmon ("Petitioner") has been in and out of prison over the years, and he has filed approximately a dozen pro se lawsuits with this court since 1990. He recently had a jury trial, where the jury rejected Plaintiff's allegation that he was subjected to excessive force by police when they arrested him for simple burglary. See Tilmon v. Shreveport, 00-cv-1524. This case was commenced by a petition for habeas corpus relief regarding the state court conviction for simple burglary that followed that arrest.

Petitioner originally asserted five claims in his federal petition, but the court pointed out that Petitioner did not first exhaust his state court remedies with respect to some of the claims. Petitioner was advised of his procedural choices. Doc. 14. He elected to move to amend his petition and dismiss without prejudice Claims 3, 4, and 5. Docs. 15 and 16. The remaining claims are ineffective assistance of trial counsel and wrongful denial of a motion to suppress a suggestive identification.

**Relevant Facts**

Sherelle Netter, who was then employed with the Shreveport Police Department as a 911 operator, parked her car in the parking lot of a public park commonly known as the "duck pond" in Shreveport. It was about five o'clock in the afternoon, and Ms. Netter stopped to look at a real estate book. A silver or gray car was parked on the passenger side of Netter's car.

Ms. Netter saw a maroon Lincoln enter the parking lot and park on the driver's side of her car. She saw the right side of the driver's face from a few feet away. He was a black man with a medium complexion. She did not see anyone else in the Lincoln. The Lincoln soon left its parking spot and moved next to the silver car. The man got out of the car with a fishing pole and walked down to the pond. Ms. Netter saw him return to the parking lot without the pole. The man walked between the Lincoln and the silver car, and he bent down and began "messing" with the door handle of the passenger side of the silver car. Ms. Netter called 911 and began to describe what was happening.

Ms. Netter saw the man get a tire tool from the Lincoln and break the passenger window of the silver car. She then drove from the parking lot and across the street. She tried to see the license number to report to the police but could not do so. She saw the man get inside the silver car, open its trunk, and take a light-colored object from the trunk. Ms. Netter testified that she described the man to the 911 operator as wearing a gray shirt (and she did not recall anything on the shirt), flip-flop or slip-on shoes, and glasses. Tr. 743-58.

The 911 dispatcher at one time announced that the suspect was armed with a gun and said that he was wearing "all gray." Tr. 840. Ms. Netter denied making either report to the 911 operator (who relayed the caller's information to the dispatcher, who made the broadcasts to the officers in the field).

Sgt. J. D. Reich of the Shreveport Police Department testified that he was advised that a person in a red Lincoln was committing a vehicle break-in at the duck pond. As Reich approached the park, he saw the Lincoln beginning to leave the parking lot, so he drove into the driveway, opened the door of his patrol car, and attempted to get the driver to stop the Lincoln. The driver did not stop, and Reich had to move to keep from getting hit by the car. Reich saw only one person, the driver, in the Lincoln, which left with another patrol unit pursuing it. Tr. 781-89.

Detective Lane Smith testified that he was reporting to the duck pond when he saw a maroon Lincoln leave the park and drive toward him at a high rate of speed. Smith turned around and pursued the Lincoln through Shreveport at speeds of up to 120 miles per hour. The Lincoln stopped in the Jackson Heights Projects, and the driver ran on foot with the purse. When Smith got out of his vehicle, he radioed that the driver was wearing a white shirt and khaki shorts. Smith wrote in his report that the shirt was off-white. Smith testified that he chased the man through the neighborhood, never losing sight of him, and saw the man throw the purse onto a porch area surrounded by a six-foot high wrought-iron fence. Smith eventually ran down and arrested the driver of the Lincoln, who was Petitioner. Smith also

recovered the purse from where it had been thrown. Smith identified Petitioner in the courtroom as the man he arrested. Tr. 802-19.

Officer Harry Brown testified that he joined the high-speed chase of the Lincoln, and he saw the driver when he got out of the car. Brown said the man was wearing a "light-color T-shirt and brown pants, maybe short pants." The man was carrying something in his hand that looked like a brown purse. Officer Brown lost sight of the suspect as Detective Smith was chasing him. When Brown arrived at the site of capture, two or three other officers were there with Detective Smith, and Petitioner was struggling with them. Tr. 789-93.

When the chase started, Ms. Netter went back to the park and located Kathleen Fetsch, the owner of the stolen purse. Ms. Fetsch testified that she and her husband took their grandchildren to play at the park. They locked the doors on their 1998 gray Honda Accord and went to feed the ducks. She denied that Petitioner had permission to enter her car or take her purse from the trunk. Ms. Netter and Ms. Fetsch went to the police station, where Ms. Fetsch identified her purse, which contained her wallet with identification. Tr. 772-81.

Ms. Netter said she was told that a person was in custody for the break-in, and a police officer took her down a hallway to a room with a window on the door. The suspect was inside, handcuffed and seated at a table, and some police officers were also in the room. Ms. Netter guessed that she looked at the man for 15 or 20 seconds, during which she saw only the left side of his face as he stayed seated. She testified:

> Well, I just thought it was the guy, the same guy that broke into
> the gray vehicle. Brown glasses with a gray T-shirt, that's as far

> as I noticed.  I didn't notice to look at his pants or shorts because
> it was a split-second thing to look in there and see if it was him.

Ms. Netter identified Petitioner in the courtroom and said that she was positive he was the person she saw at the duck pond.

On cross-examination, Ms. Netter was asked if the person she saw break into the car had facial hair, and she answered: "No.  Not that I recall."  She was asked if the man had any scars or tattoos, and she answered, "Not that I noticed at that time."  Defense counsel had Ms. Netter look at Petitioner's face to look for scars, and she said there was a "birthmark or something" on the right side of the face, which counsel stated was a burn mark.  Counsel asked why Ms. Netter did not notice that mark back in June 1999, and Netter said "Because of the activity that was going on.  Everything was going so fast."  She added that she saw only the left side of Petitioner's face at the police station.  Tr. 758-66.

Ms. Netter was called back to the stand later in the trial and asked if she saw the burglar's arms.  Netter said she saw just his face as she noticed him coming back to the car from the pond.  Petitioner then rolled up his sleeves in the courtroom (presumably to exhibit tattoos), and Ms. Netter was asked again if she saw tattoos on the suspect.  She repeated that she was looking at the man's face and did not notice his arms.  Tr. 821-26.

Attorney Sam Love, Jr. testified that a few days before the trial he was contacted by Wallace Tilmon, Petitioner's brother, who asked if he would notarize an affidavit by a man who claimed to have committed the crime of which Petitioner was accused, and present the affidavit to the authorities.  Love agreed to do so for $400, and Tilmon came to his office one

morning and provided the affidavit to be signed by a Ronald J. White. Mr. Tilmon paid the fee and left. A man who identified himself as Ronald White arrived about 30 minutes later, in the company of two other men, and Mr. Love asked White to review the affidavit.

The affidavit recounted that White went fishing with Petitioner at C. Bickham (Dickson) Park in Shreveport. On the way home, with White driving, Petitioner fell asleep in the car, and White stopped at the duck pond. White, according to the affidavit, broke into the car and stole the purse as Petitioner slept. In the process, he cut his finger, so he put the purse under the seat of the car he was driving, woke Petitioner, and said that he was going to wash his hands. He asked Petitioner to pick him up at the restroom area. White, per the affidavit, later returned to the parking area but did not see the car or Petitioner. He later learned from Petitioner's daughter that he had been arrested.

Attorney Love testified that he asked the man in his office if he was Ronald J. White, and the man said he was, but Love did not ask for a driver's license or any other identification, nor did he place the man under oath. Love said the man read the affidavit (although Love never asked the man if he could read or write), said it was correct, and said he wanted to sign it. Love cautioned White that he was going to take the affidavit to the Sheriff's Department. White asked if bail would be set for him, and Love said he did not know for sure. Love delivered the affidavit to a deputy sheriff later that day. Tr. 852-64.

The defense wanted to call Ronald White, who had been present in court the day earlier, sworn by the court, and instructed to return when called. Tr. 689. Mr. White did not

return, and the court issued a writ of attachment. The Bailiff and another deputy tried to locate White but could not find him. Tr. 837. A deputy testified that he went to the address provided for White but could not get an answer at the door. A young man who lived upstairs claimed to be White's brother and said he had seen him earlier that day but did not then know his whereabouts. The deputy said he had seen White in the courtroom the day before and could have recognized him. He talked to several people in the apartment complex, but White could not be located. Tr. 830-31.

A six-person jury returned a unanimous verdict of guilty of simple burglary. Tr. 888-89. The sentence was subject to enhancement based on Petitioner being a fourth-felony offender. The trial court deviated downward from a mandatory life sentence and imposed only a 24-year sentence, which the State did not appeal.

**Motion to Suppress Identification**

Defense counsel and Petitioner (pro se) filed motions to suppress the identification made by Ms. Netter on the grounds that it was unduly suggestive. It was also argued that the suggestive nature of the first identification would taint the in-court identification.

The trial court conducted a pre-trial hearing on the suppression issues. Petitioner was voluntarily absent from the courtroom, and Ms. Netter was called to testify. She described her observations in a manner consistent with her trial testimony discussed above. Detective Smith and Sgt. Reich also testified about the events surrounding the arrest and identification. After hearing argument, the trial judge denied the motions to suppress. She noted the

opportunity of the witness to view the offender at the time of the crime, the short time between the crime and the identification, and the accuracy of the description of the offender. Tr. 690-733.

A conviction based on an eyewitness identification at trial following a pretrial identification will be set aside only if the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. A two-step process governs the admissibility of identification evidence: First, a court must determine whether the pretrial identification was impermissibly suggestive; if it was, then second, a court must determine whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification. Coleman v. Quarterman, 456 F.3d 537 (5th Cir. 2006).

The Supreme Court has identified several factors to help determine the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the crime scene; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Coleman, supra, citing Neil v. Biggers, 93 S.Ct. 375 (1972). Unless the circumstances show "a very substantial likelihood of irreparable misidentification" then the identification is admissible, and its weight is for the jury to decide. Manson v. Brathwaite, 97 S.Ct. 2243, 2254 (1977).

The state appellate court, when reviewing the trial court's decision on direct appeal, applied the applicable legal standards, with citation to <u>Manson</u>. It noted that one-on-one or "show up" confrontations are not favored by the law, but they are permissible when justified by the circumstances. They are generally permitted when the accused is apprehended within a short time after the crime. Such prompt identification, although it does not benefit from a line-up, may promote accuracy and expedite the release of an innocent suspect. <u>State v. Tilmon</u>, 870 So.2d at 612-13. Federal courts have also permitted identification testimony despite a "show up" or crime scene identification. <u>See</u> <u>Livingston v. Johnson</u>, 107 F.3d 297, 309-11 (5th Cir. 1997).

The state appellate court found that the one-on-one identification was permissible because the identification was made shortly after the commission of the crime. With respect to the relevant factors, the court noted Ms. Netter's opportunity to view the perpetrator at the crime scene was ample (from both sides and the front, at a short distance) her degree of attention was great (shown by her staying on the phone with the 911 operator and describing the incident as it happened), the accuracy of her description was good (man in gray driving maroon car), her level of certainty was great, and a very short time passed between the witnessing of the crime and the identification. After considering all of the factors, the appellate court found that any suggestiveness of the identification procedure was outweighed by the overall reliability of the identification. <u>Tilmon</u>, 870 So.2d at 613.

Petitioner takes issues with the state court's assessment of most of the factors. He notes that Ms. Netter failed to observe the burn scar that covers the majority of the right side of his face or what he alleges was a heavy moustache and beard. He also notes that Ms. Netter failed to observe tattoos on this arms. He says that the description of the man being dressed in gray was incorrect. He attempts to attribute to Ms. Netter the 911 dispatcher's statement that the man was possibly armed with a gun, but the dispatcher was two persons removed from Ms. Netter, so it is not accurate to attribute that statement to Ms. Netter. Petitioner also notes that Ms. Netter showed uncertainty in her testimony as to whether it was Sgt. Reich or Detective Smith who accompanied her to the station identification.

This claim was adjudicated on the merits in the state court proceedings, so this federal habeas court may not grant relief unless that adjudication resulted in a decision that was contrary to, or involved in unreasonable application of, clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). The state court cited and applied Manson, the appropriate Supreme Court precedent, so its decision was not "contrary to" that law, and Petitioner can obtain habeas relief only if the state court's decision was an objectively unreasonable application of Manson and related precedents. See Coleman, 456 F.3d at 544.

When a state court applies general legal principles, such as those that govern this claim, the application can demand a substantial element of judgment. As a result, the federal

courts afford the state courts more leeway in reaching outcomes in case-by-case determinations. <u>Yarborough v. Alvarado</u>, 124 S.Ct. 2140, 2149 (2004). The state appellate court applied the general principles of <u>Manson</u> to the specific facts of this case in a careful fashion and reached a reasonable decision. Petitioner's principal arguments are that Ms. Netter was not reliable about her identification, which was fertile ground for cross-examination and was thoroughly explored before the jury. Petitioner does not contend that the police did anything unduly suggestive except for his contention that Officer Harry Brown testified that when he went to the park to get the victim and Ms. Netter, "I told both of them that we had the suspect. We need you to come and identify the guy." Petitioner's quotation does not accurately reflect the record. The court reporter transcribed Brown's testimony as, "I believe I told both of them that we had the suspect, and that I would like for them to follow me up to the station." Tr. 800. Defense counsel asked Brown if he told Ms. Netter he was taking her to make an identification. Brown said he did not recall, but "It is possible that I said we need you to come and ID the guy." Brown said he did not recall the specifics of his conversations with the women. Tr. 800. Thus, there is no strong evidence of unduly suggestive activity by the police. The credibility and value of Ms. Netter's testimony was carefully explored during her testimony and properly left to the jury. The relevant legal issues surrounding the admissibility of the evidence were resolved in a reasonable manner. No habeas relief is merited on this issue.

**Ineffective Assistance of Counsel**

Petitioner filed a motion for new trial, and the trial court conducted hearings related to the motion. The evidence developed at those hearings led to a claim of ineffective assistance of counsel, which was addressed on direct appeal. Petitioner faults counsel, Joseph M. Clark, for failure to confer, investigate, interview witnesses, and generally prepare for trial.

Lengthy hearings were held over three days on Petitioner's various claims in support of his motion for new trial. Part of the hearings were dedicated to his claim of ineffective assistance of counsel. Records from the Caddo Correctional Center indicated that Clark, who was Petitioner's fourth or fifth court-appointed counsel, made only one visit to Petitioner, the visit was made just a few days before the trial, and it lasted about an hour and fifteen minutes. Clark denied that this meeting was the first meeting with Petitioner. He said he often signs in at the jail to visit one client, but he might actually visit with several clients in the area. Clark also claimed that he had numerous telephone conversations with Petitioner. Clark acknowledged that he did not interview Ms. Netter or the arresting officers before trial, and he said his investigation consisted of contacting all of Petitioner's prior attorneys, reviewing the file and discovery materials, and discussing the case with Petitioner.

Clark became aware of the Ronald White affidavit a few days before trial, but he did not try to talk to White because he did not have any contact information. Petitioner asked Clark why he did not introduce the "tennis shoes" that Petitioner was wearing at the time of

arrest (to contradict Ms. Netter's claim that he wore flip flops) or Petitioner's shirt that had writing on it (not mentioned by Ms. Netter). Clark said he did not believe the shoe issue would have affected the outcome in any way. (It should be noted that Petitioner repeats throughout his filings that Ms. Netter said he was wearing flip flops, but she actually said he was wearing flip flops or slip-on shoes, so his wearing what he describes as "tennis shoes" might not be so different from Netter's testimony as Petitioner suggests.) As for the shirt, Clark said he chose to focus on what he believed was the "strongest possible evidence" to undermine the identification, and that was the scarring on Petitioner's face that was readily visible to the jury but not noticed by Ms. Netter.

Petitioner also asked Clark why he did not present a booking photograph to show that Petitioner had facial hair at the time of the arrest. He also asked why Clark did not introduce any evidence that Petitioner was burned in 1958 (which would have rebutted a closing argument suggestion by the prosecutor that the burn could have been of post-arrest origin). Clark said he believed that the issues had been adequately addressed at the trial. Petitioner also pointed out that the shorts he was wearing at the time of arrest were greenish in nature and not khaki as the witnesses said. Petitioner asked Clark why he did not request a continuance when Ronald White did not return to court, but Mr. Clark said he frankly could not recall White's role in the case due to the passage of time. Transcripts of the hearings on the motion for new trial began at Tr. 963 and continued through Tr. 1213.

The trial judge stated that she had listened to all of the evidence and reviewed the relevant filings and found that "based on the totality of the evidence adduced, the motion for new trial is not supported by law or the evidence; and the Court denies defendant's motion for new trial at this time." Tr. 1210. The state appellate court reviewed the ineffective assistance arguments as well as others included in the motion for new trial. The court cited the relevant <u>Strickland</u> standards and found that the facts from the hearings "clearly support" the trial judge's denial of the motion. It noted that many of Petitioner's factual representations were "inaccurate and/or distorted" and that he had failed to demonstrate that Clark's representation fell below the standard of reasonableness. Assuming error, the court opined that there was not a reasonable probability that the outcome of the trial would have been different had counsel acted otherwise. <u>State v. Tilmon</u>, 870 So.2d at 615-18.

Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel. Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland v. Washington</u>, 104 S.Ct. 2052, 2064 (1984). Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome. <u>Id</u>. 104 S.Ct. at 2068.

The test for federal habeas purposes is not whether a petitioner made the showing required under Strickland. The test is whether the State court's decision – that the petitioner did not make the Strickland showing – was an objectively unreasonable application of the standards provided by Strickland's clearly established federal law. Williams v. Taylor, 120 S.Ct. 1495 (2000); Henderson v. Quarterman, 460 F.3d 654, 665 (5th Cir. 2006).

It is not clear what aspects of Clark's testimony the state court accepted, such as whether he met with Petitioner only once just before trial or several times and had several telephone conversations. This court has only the rather unexplained conclusion of the state court to which it must nonetheless afford deference. Presumably, to reach the result it did, the state court accepted all or most of Clark's testimony. That testimony still left unexplained to a great extent why Clark did not introduce the booking photograph and seized clothing, which would have further undermined Ms. Netter's testimony. Then Clark admits that he did not interview Ms. Netter or the other eyewitnesses before trial.

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 104 S.Ct. at 2066. The Fifth Circuit has held that failure to interview eyewitnesses constitutes deficient representation, and it has rejected an argument that vigorous cross-examination of the eyewitness at trial can cure the failure to interview the witness before trial. Anderson v. Johnson, 338 F.3d 382, 391 (5th Cir. 2003). But even if there has been defective performance, habeas relief is not warranted unless the poor performance caused prejudice

– a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 104 S.Ct. at 2068; <u>Anderson</u>, 338 F.3d at 393.

Thus, the focus here is on whether there was prejudice from the lack of pre-trial interviews and other shortcomings asserted by Petitioner. Vigorous cross-examination may not cure and render competent failure to interview witnesses or conduct other pre-trial investigation, but it is relevant to whether any prejudice stems from that error. Clark conducted a fairly detailed cross-examination of Ms. Netter, pointing out some mistakes in her testimony and emphasizing that she failed to notice Petitioner's facial scar or his tattoos. Had counsel interviewed Ms. Netter before trial, perhaps he would have thought to have the booking photo and clothes available to further impeach her description. He might have also thought to call a witness to establish when Petitioner was scarred.

The question is whether it was an objectively unreasonable application of <u>Strickland</u> for the state court to determine that these omissions did not give rise to a reasonable probability that the outcome of the trial would have been different. Petitioner has, with the benefit of time and hindsight, pointed out many ways in which counsel could have presented a better defense, and it is possible that some of those defense tactics would have been exercised had a better pre-trial investigation been conducted. A reasonable person might argue that those better defense strategies might reasonably have resulted in a not guilty verdict, but a reasonable person could also argue that Ms. Netter's testimony, even if attacked

by the other strategies, would have still been sufficient when combined with the other evidence so that there is no reasonable probability that the verdict would have been not guilty had those additional tactics been employed. The key aspect of Ms. Netter's testimony is that she saw one man and one man only arrive in a maroon Lincoln, break in the Honda, steal a purse, and leave in the maroon Lincoln. Detective Lane began pursuit of the Lincoln immediately after the car left the park, he maintained sight of the Lincoln and Petitioner until Petitioner was chased down and arrested, and he saw Petitioner throw the purse. Lane's initial description of Petitioner was somewhat off the mark and similar to Ms. Netter's description, but there is no question that it was Petitioner who he chased and tackled after he gave that description.

A related issue is Petitioner's contention that counsel should have conducted a pre-trial interview of Ronald White and requested a continuance when White did not appear to testify. Clark testified that he did not have any contact information for White, and there is no evidence to the contrary. Clark said he learned of White only just before trial, and Clark did secure White's appearance in the courtroom at the commencement of the trial. The judge placed White under the rule of sequestration and ordered him to return when he was needed to testify. White then disappeared, and a sheriff's deputy could not locate him. The deputy testified, and there is nothing in his testimony to suggest that more time would have resulted in White being located. There is also serious doubt that the trial judge would have granted a continuance of a jury trial that was well underway.

Reasonable persons might conduct a de novo review of these issues and reach different conclusions. The trial judge conducted days of hearings on these issues and concluded that relief was not merited. The appellate court thoroughly reviewed that same evidence, applied <u>Strickland</u>, and determined that there was no prejudice. Reasonable persons might disagree with that determination, but it is the undersigned's opinion that the state court's decision was not so demonstrably incorrect as to be an objectively unreasonable application of <u>Strickland</u>. <u>See</u> <u>Yarborough v. Gentry</u>, 124 S.Ct. 1, 4 (2003) (when state court's application of <u>Strickland</u> is challenged, "it must be shown to be not only erroneous, but objectively unreasonable.").The conviction should not be vacated based on this final issue.

Accordingly;

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be **denied** and that Petitioner's complaint be dismissed with prejudice.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 13th day of January, 2009.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE